STATE OF CONNECTICUT *v.* LEO F. RITROVATO
(AC 23189)

Bishop, West and Peters, Js.

Argued March 29—officially released October 19, 2004

*G. Douglas Nash*, special public defender, with whom, on the brief, were *Christopher Duby* and *Joseph Danielowski*, certified legal interns, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Kevin T. Kane*, state's

attorney, and *David J. Smith*, assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Leo F. Ritrovato, was charged in a nine count information stemming from two separate incidents involving a fifteen year old girl. As to the first incident, which occurred on August 2, 2000, the defendant was convicted of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) (count two), sale of a hallucinogenic substance by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b) (count four), sale of a controlled substance to a person younger than eighteen years of age in violation of General Statutes § 21a-278a (count five), and two counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1) (count six) and (2) (count three).[1] He was acquitted of all charges related to an incident alleged to have occurred on August 13, 2000.[2]

The defendant appeals from the judgment of conviction, claiming that (1) the evidence was insufficient to support his conviction on counts four, five and six concerning his having given a hallucinogenic substance to the fifteen year old victim, T,[3] (2) the prosecutor violated the defendant's federal due process rights[4] to

[1] The defendant was acquitted of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) in connection with the August 2, 2000 incident.

[2] The defendant was acquitted of sexual assault in the first degree in violation of General Statutes § 53a-70, sexual assault in the second degree in violation of General Statutes § 53a-71 and risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (2) in connection with the alleged August 13, 2000 incident.

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[4] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

a fair trial as a result of misconduct in closing argument and in the questioning of a witness, (3) the court improperly precluded impeachment evidence in violation of the defendant's sixth amendment right to confront witnesses and to present a defense,[5] and (4) the court improperly instructed the jury that to find the defendant guilty of risk of injury to a child, it had to find that his conduct was "likely to impair the child's health or morals" and that the term "likely" was to be understood as meaning that in all "probability or possibility" the defendant's conduct had impaired the victim's health or morals.[6] We affirm the judgment of the trial court.

## I

## BACKGROUND

The record reveals the following procedural facts and evidence relevant to our discussion of the issues on appeal. In July, 2000, T moved from New Mexico to Connecticut to live with her cousin, M. Approximately two weeks later, T began baby-sitting for the defendant's three daughters at the defendant's home. On the morning of August 2, 2000, the defendant arrived at M's home to pick up T and to bring her to his home to baby-sit. At trial, T testified that the defendant told her that he was going to get some "acid." T then asked if she could have some, stating that she had "never done acid before." According to T, after she and the defendant arrived at the defendant's house, he told her that he

[5] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The sixth amendment to the United States constitution also encompasses the right to present a defense and the right to present the defendant's version of the facts to the jury. State v. Carter, 228 Conn. 412, 422, 636 A.2d 821 (1994).

[6] Originally, the defendant also claimed that his conviction of sale of a hallucinogenic substance by a person who is not drug-dependent and sale of a controlled substance to a person younger than eighteen years of age violated the constitutional prohibition against double jeopardy. That claim subsequently was withdrawn.

had twelve "hits" of "acid" on a strip of thin paper. T also testified that the defendant asked her if she had ever had sex before because "acid made him horny, and it made sex more better, more intensified." The defendant then "cut up the acid" by slicing the paper into twelve strips and offered T one "hit." T asked the defendant to put it on her tongue because she "didn't know what [she] was doing." T ingested one piece of the paper that the defendant placed on her tongue. Approximately thirty minutes to one hour later, T began to see "unusual things" such as a cat singing to her and a rug waving to her. T testified that the effects of the substance she ingested lasted for several hours. In addition, T testified that the defendant told her that the paper he placed in her mouth was LSD[7] and that he uses the terms "acid" and LSD interchangeably. She also stated that the defendant told her that he would give her the LSD as payment for the hours she watched his children.

Later in the evening of August 2, 2000, the defendant and his wife, Janine Ritrovato, went to a movie, leaving T to watch the children. The couple returned approximately four hours later and watched a movie with T. About halfway through the movie, Janine Ritrovato went to bed, leaving the defendant and T to finish watching the movie. The defendant then asked T to go for a walk. While walking, the defendant pulled T close to him. T objected to that and walked ahead of the defendant. The defendant then grabbed T from behind and led her to a secluded spot where they engaged in vaginal intercourse. Following the incident, T and the defendant returned to the defendant's home. There, she wrote on her calendar, "[M]y day! 1st Leo." T testified that this

---

[7] " 'LSD' refers to lysergic acid diethylamide; The Merck Index, (9th Ed. 1976) p. 732; which is a hallucinogenic substance." *State* v. *Ryan*, 182 Conn. 335, 336 n.2, 438 A.2d 107 (1980).

meant that it was her first time having sexual intercourse.

Not long after that incident, T was forced to move out of M's leased home, as the landlord had expressed concerns about T's occupancy. The defendant and his wife let T stay with them until the problem was resolved. T testified that on August 13, 2000, the defendant again forced her to have vaginal intercourse with him. The following day, T informed her mother and M that she wanted to return to New Mexico. When asked why, T told her mother that she had been "touched in a way that [she] didn't like." Later, on August 18, 2000, T told M about both incidents. After hearing T's story, M took her to the police station where T gave a statement. Eventually, T also went to Planned Parenthood of Connecticut, Inc., for a physical examination. There she spoke to counselor Janet St. Jean about the incidents.

After the defendant was arrested and taken into custody at his home on October 6, 2000, he provided Officer Mark Pilcher of the Norwich police department with a written statement in which he stated that he had obtained LSD and given it to T on different occasions. According to the defendant's statement, which was admitted into evidence during trial, T asked him to get LSD, and he received M's permission to give it to her. The defendant's statement also contained a denial of any sexual contact with T.

Trial began on February 26, 2002. On March 13, 2002, the jury found the defendant guilty of sexual assault in the second degree, two counts of risk of injury to a child, sale of a hallucinogenic substance by a person who is not drug-dependent and sale of a controlled substance to a person younger than eighteen years of age. All of those offenses stemmed from the events of August 2, 2000. The defendant was sentenced to a term of twenty-two years imprisonment, execution sus-

pended after seventeen years, and ten years of probation. On appeal, the defendant advances four arguments, which we address in turn. Additional facts will be recited as appropriate to our resolution of the issues on appeal.

## II

## SUFFICIENCY OF THE EVIDENCE

The defendant's initial contention is that the state's evidence at trial was insufficient to warrant a guilty verdict on counts four, five and six.[8] Specifically, he argues that the state failed to prove beyond a reasonable doubt that the substance he gave T was, in fact, LSD, a hallucinogenic substance. The defendant claims that the only evidence offered to prove that the substance was LSD was his representation as such, T's description of the medium by which she ingested the substance and the effect that it had on her. We disagree.

In reviewing the defendant's claim, the principles that guide our inquiry are not novel. We construe the evidence, direct and circumstantial, in the light most favorable to sustaining the verdict and decide whether that evidence, including the inferences reasonably drawn therefrom, enabled a rational jury to conclude that the cumulative force of the evidence established the defendant's guilt beyond a reasonable doubt. See *State* v.

[8] The defendant concedes that his claim of insufficiency of the evidence was not preserved properly at trial and, as such, seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Our Supreme Court, following the dictate of the United States Supreme Court in *Jackson* v. *Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), has held that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right and therefore would necessarily satisfy the requirements for *Golding* review. . . . Accordingly, no practical reason exists to engage in a *Golding* analysis of a sufficiency of the evidence claim and, therefore, we review the challenge as we do any properly preserved claim." (Citation omitted.) *State* v. *Daniels*, 83 Conn. App. 210, 221, 848 A.2d 1235, cert. denied, 270 Conn. 913, 853 A.2d 528 (2004).

*Nunes*, 260 Conn. 649, 659, 800 A.2d 1160 (2002). "Each essential element of the crime charged must be established by such proof . . . and although it is within the province of the jury to draw reasonable, logical inferences from the facts proven, they may not resort to speculation and conjecture." (Internal quotation marks omitted.) *State* v. *Cosgrove*, 181 Conn. 562, 585, 436 A.2d 33 (1980).

With those familiar principles in mind, we turn to the merits of the defendant's claim. Because the defendant challenges his conviction of three separate offenses, each of which required the state to prove different essential elements, we split the defendant's claim into separate arguments, examining each sequentially.

## A

### Sale of a Hallucinogenic Substance by a Person Who is Not Drug-Dependent

In count four of the information, the state charged the defendant with the crime of sale of a hallucinogenic substance by a person who is not drug-dependent, namely, LSD, in violation of § 21a-278 (b), which provides in relevant part: "Any person who . . . sells . . . any narcotic substance, hallucinogenic substance[9] other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor

---

[9] General Statutes § 21a-240 (23) defines "hallucinogenic substances" as "psychodysleptic substances which assert a confusional or disorganizing effect upon mental processes or behavior and mimic acute psychotic disturbances. Exemplary of such drugs are mescaline, peyote, psilocyn and *d-lysergic acid diethylamide,* which are controlled substances under this chapter unless modified . . . ." (Emphasis added.)

more than twenty-five years. . . ." Thus, in the present case, the state had to prove beyond a reasonable doubt that the substance the defendant gave to T actually was a hallucinogenic substance, namely, LSD. Cf. *State* v. *Gayle*, 64 Conn. App. 596, 601, 781 A.2d 383 ("To prove sale of a narcotic substance [t]he state [must] prove . . . that the substance sold was a narcotic. . . . Proof of the exact nature of the substances upon which the prosecution is grounded, of course, is necessary . . . ." [citation omitted; internal quotation marks omitted]), cert. denied, 258 Conn. 920, 782 A.2d 1248 (2001); see also *State* v. *Baskins*, 12 Conn. App. 313, 316, 530 A.2d 663 (to sustain burden of proving defendant sold narcotic substance, state had to prove accused sold specific drug [heroin] it accused him of selling), cert. denied, 205 Conn. 811, 532 A.2d 586 (1987).

In claiming that the evidence was insufficient, the defendant asserts that the state failed to prove beyond a reasonable doubt that the substance given to T actually was LSD.[10] On the basis of our review of the record, we believe there was adequate circumstantial evidence from which the jury reasonably could have inferred that the substance given to T by the defendant was LSD.

We begin by noting that at trial, the state introduced neither expert testimony nor any objective analysis of the substance to identify it as LSD. Rather, the state's evidence concerning the identity of the substance was entirely circumstantial. That fact alone, however, is not dispositive, because the identity of a hallucinogenic substance may be proven by circumstantial evidence. Cf. *State* v. *Baskins*, supra, 12 Conn. App. 316 (state

---

[10] The state claimed that the sale consisted of the defendant's agreement to provide LSD to T in return for her baby-sitting services. On appeal, the defendant does not challenge that such a transaction, if proven, would constitute a sale. Additionally, the defendant does not contest the sufficiency of the evidence that he gave the substance to T in return for baby-sitting services.

could satisfy burden of proving defendant sold narcotic substance with circumstantial evidence alone).

Although our review of decisional law reveals that the circumstantial evidence usually contemplated for the purpose of proving the identity of an illicit substance normally entails the opinion testimony of someone who is sufficiently familiar with the alleged substance, other forms of circumstantial evidence also have been admitted to prove the identification of the substance. Thus, evidence of the identify of a substance may include, but is not limited to (1) opinion testimony of a witness who couples past use and present experience with the substance in question,[11] (2) the name by which the defendant refers to the substance,[12] (3) testimony concerning the use of the *substance in question* and its subsequent physiological effect on the user,[13] (4) testimony of someone sufficiently familiar with the use of the *alleged substance* concerning the distinguishing visual characteristics of it, the way in which it is ingested and its subsequent physiological effect on the user,[14] (5) testimony concerning the price paid or asked for the substance[15] and (6) testimony concerning the way in which the transaction was carried out.[16]

Of course, the admission of circumstantial evidence to prove the identity of a substance does not mean that that evidence alone always is sufficient proof of the identity of a substance. When circumstantial evidence is the basis for establishing the identity of the substance, whether that evidence is sufficient must be decided

[11] See *United State* v. *Atkins*, 473 F.2d 308, 314 (8th Cir.), cert. denied, 412 U.S. 931, 93 S. Ct. 2751, 37 L. Ed. 2d 160 (1973).

[12] See *State* v. *Cosgrove*, supra, 181 Conn. 587, citing *United States* v. *Lawson*, 507 F.2d 433, 439 (7th Cir. 1974), cert. denied, 420 U.S. 1004, 95 S. Ct. 1446, 43 L. Ed. 2d 762 (1975).

[13] See *State* v. *Nunes*, supra, 260 Conn. 669–70.

[14] See *State* v. *Nunes*, supra, 260 Conn. 664–69.

[15] See *State* v. *Meehan*, 260 Conn. 372, 382, 796 A.2d 1191 (2002).

[16] See *State* v. *Meehan*, 260 Conn. 372, 382, 796 A.2d 1191 (2002).

on a case-by-case basis. The evidence in this instance, viewed in a light most favorable to sustaining the verdict, reveals that the defendant told the police and T that the substance he gave to her was LSD, that the substance was on thin paper that he cut into squares before placing it on her tongue, that she chewed and swallowed the substance, that shortly after doing so, she saw a cat singing and a rug waving to her, and that she felt the effects of the substance for several hours.

Thus, the jury was presented with the defendant's statement against penal interest that he gave LSD to T, T's description of the substance and its manner of transfer, and her testimony concerning her mental state shortly after she ingested the substance. The question confronting us then, is whether the jury reasonably could have inferred from that evidence that the substance given to T by the defendant was LSD. Recognizing that this precise question has yet to be answered in Connecticut, we conclude that the evidence provided an adequate evidentiary basis for the jury's verdict.

First, as noted, the statements by the defendant to T and to the police that the substance he gave to her was LSD were admitted properly as evidence on the issue of the identity of the substance as LSD. See *State v. Cosgrove*, supra, 181 Conn. 587. We acknowledge that those statements alone would be insufficient to identify the substance. The defendant's statements, however, were corroborated by evidence concerning the medium by which the substance was transferred, the manner of ingestion and T's hallucinations shortly thereafter. Although we do not believe that the packaging and mode of ingestion of LSD is sufficiently within the common knowledge of jurors such that they reasonably could have inferred from that evidence that the substance was LSD, we do believe that the average layperson could have concluded from T's testimony that she was, in fact, hallucinating when she believed that she

saw a cat singing and a rug waving to her shortly after ingesting the substance.

Finally, we note that in its instructions to the jury, the court stated: "A hallucinogenic substance is defined as . . . a psychodysleptic substance which asserts a confusional or disorganizing effect upon mental process or behavior, and mimics acute psychotic disturbances. Examples of such drugs are . . . lysergic acid . . . diethylamide, commonly known as LSD." Faced with the court's definition of LSD as a hallucinogenic substance and a description of its effects, and confronted with the defendant's identification of the substance as LSD, which was corroborated by T's testimony about her mental state shortly after ingesting it, we conclude that the cumulative effect of that evidence formed an adequate evidentiary basis for the jury's determination that the substance was, in fact, LSD. See *State v. Nunes*, supra, 260 Conn. 659–61.

B

Sale of a Controlled Substance to a Person Younger Than Eighteen Years of Age

The fifth count of the information charged the defendant with sale of a controlled substance to a person younger than eighteen years of age in violation of § 21a-278a. Section 21a-278a (a) provides in relevant part: "Any person . . . who violates section . . . 21a-278 . . . by distributing, selling, prescribing, dispensing, offering, giving or administering any controlled substance to another person who is under eighteen years of age . . . shall be imprisoned for a term of two years . . . ." Thus, to establish the defendant's guilt on that count, the state had to prove beyond a reasonable doubt, inter alia, all the essential elements of the offense of selling a hallucinogenic substance in violation of § 21a-278. Cf. *State v. Denby*, 235 Conn. 477, 487, 668 A.2d 682 (1995); *State v. Lewis*, 67 Conn. App. 643, 647,

789 A.2d 519, cert. denied, 261 Conn. 938, 808 A.2d 1133 (2002). Given our determination in part II A that the evidence was sufficient to prove a violation of § 21a-278, we conclude that the state met its burden of proving the defendant guilty of violating § 21a-278a.

## C

### Risk of Injury to a Child

The sixth count of the information charged the defendant with the crime of risk of injury to a child in violation of § 53-21 (1).[17] Specifically, the state alleged that the defendant's giving a hallucinogenic substance to T, a child, was an act that was likely to impair her health or morals. The crime of risk of injury to a child in this case required proof beyond a reasonable doubt that: (1) T was younger than sixteen years old; (2) the defendant had perpetrated an act on T; (3) the act was likely to be injurious to T's health; and (4) the defendant had a general criminal intent to perform the act. See General Statutes (Rev. to 1999) § 53-21; see also State v. Martin, 189 Conn. 1, 7–8, 454 A.2d 256, cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983). The parties do not dispute that T was younger than sixteen years of age or that the defendant perpetrated an act on her. Instead, the defendant argues, in essence, that there was insufficient evidence to prove beyond a reasonable doubt that he had a general criminal intent to perform the act or that the act was likely to be injurious to T's health. In short, the defendant contends that the evidence was insufficient to prove those essential elements because the state failed to prove that the substance the defendant gave to T was LSD. We disagree.

---

[17] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that . . . the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

As noted, to establish guilt of risk of injury to a child, the state need only prove beyond a reasonable doubt that the defendant committed an act that was likely to impair T's health. *State* v. *Martin*, supra, 189 Conn. 7–8. As we noted in part II A, the evidence adduced at trial was sufficient for the jury to have concluded that the substance given to T by the defendant was the hallucinogen, LSD.[18] Thus, the jury was offered sufficient evidence that, if credited, satisfied the state's burden of proof.

As to the element of intent, the state adduced evidence that the defendant wilfully gave T the illegal hallucinogenic substance, LSD. That evidence provided sufficient support for the jury's finding that the defendant possessed the general criminal intent to perform the act because the evidence established that the act was voluntary and demonstrated a reckless disregard of the consequences. See *State* v. *Davila*, 75 Conn. App. 432, 438, 816 A.2d 673 ("intent to do some act coupled with a reckless disregard of the consequences . . . of that act is sufficient to find a violation of [§ 53-21]" [citation omitted; internal quotation marks omitted]), cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004). From the defendant's statements to the police and to T that the substance he gave T was LSD, the jury reasonably could have concluded beyond a reasonable doubt that in voluntarily giving to a child a substance that the defendant believed to be a controlled substance, he acted with reckless disregard of the consequences, the impairment of T's mental health.

Finally, with regard to the last element of the offense, the likely impairment of T's health, the state offered T's testimony that shortly after the defendant placed

[18] We note that unlike the situation with the crimes discussed in parts II A and B, proof of the exact nature of the substance is not an essential element of the offense of risk of injury to a child.

the substance on her tongue and she ingested the substance, she began to see "unusual things" such as a cat singing to her and a rug waving to her, and that she felt the effects of the substance for several hours after its consumption. That testimony was sufficient to support the jury's finding that the defendant's act of giving T the substance was likely to impair her health because it did, in fact, impair her mental health by altering her mind. See *State* v. *Payne*, 240 Conn. 766, 771, 695 A.2d 525 (1997) (because "health" means state of being hale, sound or whole in body, mind or well-being, mental health encompassed by legislature's use of term in § 53-21), overruled in part on other grounds, *State* v. *Romero*, 269 Conn. 481, 849 A.2d 760 (2004). We therefore conclude that the evidence presented at trial was sufficient to support the defendant's conviction of risk of injury to a child in violation of § 53-21 (1).

## III

## PROSECUTORIAL MISCONDUCT

The defendant's next claim is that the prosecutor overstepped his bounds during direct examination and closing argument. The claim stems from the prosecutor's purposeful elicitation of testimony regarding the credibility of the state's only eyewitness and the prosecutor's later reference to that testimony in summation. The defendant urges us to overturn his conviction because the prosecutor's misconduct deprived him of a fair trial. We disagree. Although we believe that the prosecutor committed misconduct, that misconduct did not give rise to a deprivation of the defendant's constitutional right to a fair trial.

At the outset, we note that the defendant's claim of prosecutorial misconduct was not preserved at trial.[19]

---

[19] The defendant seeks review of his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), the plain error doctrine; Practice Book § 60-5; and this court's supervisory powers over the administration of justice.

Nonetheless, we will review it, as we do preserved claims of misconduct.[20] See *State* v. *Stevenson*, 269 Conn. 563, 572–75, 849 A.2d 626 (2004) (analyzing unpreserved prosecutorial misconduct claim as if preserved for appellate review). In so doing, we undertake a two-pronged inquiry. See id., 572. First, we determine whether the challenged conduct was improper. See id. If we answer that question in the affirmative, we then assess whether that misconduct, when viewed in light of the entire trial, deprived the defendant of his due process right to a fair trial. See id.

A

Misconduct

To assess the validity of the defendant's claim, we first must determine whether the prosecutor engaged in misconduct. See *State* v. *Beaulieu*, 82 Conn. App. 856, 868, 848 A.2d 500, cert. granted on other grounds, 270 Conn. 908, 853 A.2d 524 (2004). The defendant maintains that on two occasions, the prosecutor improperly bolstered the credibility of the victim. Specifically, he contends that the questions the state asked a witness during direct examination were improper because the witness was asked to comment on the credibility of another witness, in this case, T. The defendant also argues that the prosecutor impermissibly emphasized the responses to those improper questions during his summation. We agree in part.

The following additional facts set the context for our analysis. At trial, the defendant's innocence or guilt

[20] That does not mean, however, that the absence of an objection at trial does not play a significant role in our analysis of the defendant's claim. "To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 575, 849 A.2d 626 (2004).

depended almost entirely on T's credibility.[21] The only other evidence that the state produced that did not bear on T's credibility consisted of the defendant's statement to the police in which he stated that he gave LSD to T, but denied her claims of sexual assault. In support of T's credibility, the state provided the jury with the testimony of three constancy of accusation witnesses, including the counselor, St. Jean. St. Jean testified that she formerly was employed at Planned Parenthood of Connecticut, Inc., for three years. She further testified that during her employment, her duties primarily consisted of counseling female patients about "reproductive health, rape, domestic abuse [and] pregnancy issues." St. Jean stated that in addition to attending medical assisting school where she was educated in counseling, she had completed approximately 600 hours of "on-the-job training" in which she witnessed or conducted "hundreds" of counseling sessions. St. Jean testified that she counseled T on August 23, 2000, and that during that session, T told her that she had been drugged and forcibly raped on one occasion, and forcibly raped again on another occasion.

Once defense counsel's cross-examination was completed, the state conducted its redirect examination of St. Jean, during which the prosecutor posed the following questions to which defense counsel did not object:

"[The Prosecutor]: On the instance that happened . . . when she was talking to you, specifically about the second, about both instances, without going into detail on them, *did you find them credible?*

"[The Witness]: Oh, yes.

"[The Prosecutor]: *In your opinion as a counselor,* a person that's done hundreds of counseling sessions,

---

[21] The defendant did not testify.

*did you find her statements on being raped twice by that person credible?*

"[The Witness]: Yes.

"[The Prosecutor]: *Did you find her statements* that . . . force was used against her as *credible?*

"[The Witness]: Yes.

"[The Prosecutor]: Did you have any reason to doubt what she was telling you?

"[The Witness]: No." (Emphasis added.)

Later, in his initial closing argument to the jury, the prosecutor stated, inter alia: "St. Jean testified that she had hundreds of hours of training, that she dealt in counseling people that were victims of sexual assault [and] *that when the victim came in, she was credible to her.*" (Emphasis added.) The prosecutor also stated that it was the jury's job to "judge [the] facts and the credibility of the people," and that what he had argued was not in evidence.

After the parties completed their closing arguments, the court issued its general charge to the jury. The court instructed the jury in relevant part: "You have observed the witnesses. The credibility, the believability of the witnesses and the weight to be given to their testimony are matters entirely within your own hands. It is for you alone to determine their credibility. . . . The credibility of the witness . . . is for you to determine. . . . You should, in short, size up the witnesses, and make your own judgment as to their credibility, and decide what portion—some, all or none—of any particular witness' testimony you will believe on these principles."

Later, the court instructed the jury that "it is your duty to resolve any conflicts in the testimony and find where the truth lies. And in doing so, the credibility of the . . . witnesses is entirely within your duty as

jurors." The court subsequently repeated that instruction two more times before concluding the charge. Finally, the jury indicated to the court that it would like to rehear the testimony of both T and St. Jean. The court subsequently allowed the jury to do so.

It is against that factual backdrop that we assess the defendant's claim of misconduct. We look first to the prosecutor's questioning of St. Jean and then turn to the prosecutor's emphasis of that testimony during closing argument. "A prosecutor may not ask any witness to comment on the credibility or veracity of another witness' *testimony*." (Emphasis added.) *State* v. *Beaulieu*, supra, 82 Conn. App. 869, citing *State* v. *Singh*, 259 Conn. 693, 706–708, 793 A.2d 226 (2002). In the present case, we note that the prosecutor did not directly ask St. Jean to comment on the credibility of T's *testimony*, but rather on the credibility of T's *statements during counseling*. That is, however, a distinction bereft of any meaningful difference. Decisional law relative to testimony concerning victim credibility makes clear that the prosecutor's questions in this instance were improper.

In asking her "opinion as a counselor, a person that's done hundreds of counseling sessions," the prosecutor's questioning called on St. Jean to testify as if she were a mental health expert.[22] It is a well settled evidentiary precept that an expert may not testify regarding the credibility of the victim, as that determination is solely within the province of the jury.[23] See *State* v. *Grenier*, 257 Conn. 797, 806, 778 A.2d 159 (2001) (our Supreme Court "repeatedly [has] stated that an expert

---

[22] Additionally, we note that to the extent that the questioning called on St. Jean to testify as if she were an expert when she had never been so qualified, it also was improper. See *State* v. *Beaulieu*, supra, 82 Conn. App. 869 n.10.

[23] That proscription applies equally to lay witnesses. See *State* v. *Thompson*, 266 Conn. 440, 452–55, 832 A.2d 626 (2003).

may not testify regarding the credibility of a particular victim"); see also *State* v. *Singh,* supra, 259 Conn. 707, citing *United States* v. *Forrester,* 60 F.3d 52, 63 (2d Cir. 1995) ("[a]s a matter of law, the credibility of witnesses is exclusively for the determination by the jury . . . ." [citations omitted; internal quotation marks omitted]).

In *State* v. *Grenier,* supra, 257 Conn. 797, our Supreme Court held that when an expert impermissibly does testify that the victim's statements were credible, that testimony may be characterized as "a direct assertion that validated the truthfulness of [the victim's] testimony." (Internal quotation marks omitted.) Id., 806. Accordingly, we believe that when the prosecutor purposefully elicited testimony that T spoke credibly during counseling with regard to the charges for which the defendant was on trial, the prosecutor essentially asked the witness to comment indirectly on the credibility of T's testimony. Such conduct is equally as improper as asking a witness to comment on the credibility of another witness' testimony. We conclude, therefore, that the prosecutor exceeded the bounds of proper argument by asking St. Jean if she found credible T's statements about having been sexually assaulted and drugged.

The defendant also attacks the propriety of the prosecutor's statement in initial closing argument to the jury. Specifically, the defendant claims that the prosecutor, in recapitulating St. Jean's testimony, improperly argued "matters that should not have been in evidence."

As noted, the prosecutor stated during initial closing argument to the jury: "St. Jean testified that she had hundreds of hours of training, that she dealt in counseling [with] people that were victims of sexual assault [and] *that when the victim came in, she was credible to her.*" (Emphasis added.) St. Jean's testimony concerning T's credibility came into evidence without

objection. "Our decisional law on prosecutorial misconduct makes clear that as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts *in evidence* and the reasonable inferences to be drawn therefrom." (Emphasis in original; internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 806, 837 A.2d 849, cert. denied, 268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004). Although we are unaware of any decisional law that precludes a prosecutor from arguing a matter in evidence simply because the matter would not have been admissible had there been a proper objection, we are mindful that our Supreme Court has explicitly ruled that questions asking one witness to comment on the veracity of another witness are impermissible because they are invasive of the province of the jury. *State* v. *Singh*, supra, 259 Conn. 707. In this instance, however, we need not reach the question of whether counsel's argument to the jury constituted misconduct because the claim fails under our due process analysis.

B

Due Process Analysis

Our examination of the validity of the defendant's conviction does not end with the identification of prosecutorial impropriety. As our Supreme Court has stated: "[T]he ultimate question is, in light of the conduct that we have concluded was improper, whether the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 756, 850 A.2d 199 (2004). In other words, we must determine "whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." *State* v. *Thompson*, supra, 266

Conn. 460. "This final determination requires . . . the consideration of several factors: the extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the strength of the curative measures adopted and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Santiago,* supra, 756. Those factors were first set forth in *State* v. *Williams,* 204 Conn. 523, 540, 529 A.2d 653 (1987).

The defendant claims that prosecutorial misconduct deprived him of a fair trial because: (1) he did not invite the misconduct; (2) the misconduct was frequent, as it occurred during the state's redirect examination and, later, was emphasized during the state's summation and was replayed to the jury upon request; (3) the misconduct was severe because the prosecutor elicited from St. Jean, a witness the prosecutor treated as a mental health expert, an opinion regarding T's credibility; (4) the misconduct was central to the critical issue in the case: T's credibility; (5) the state's case was not strong, as it depended solely on T's credibility; and (6) the court did not employ any measures to cure the impropriety. We disagree. Even if we assume arguendo that the state's case was not strong and that the misconduct was severe and central to the critical issues in the case,[24] our review of the record reveals that the fundamental fairness of the trial was not called into doubt by the prosecutor's misstep. The jury's not guilty verdict on counts seven through nine, relative to the alleged August 13, 2000 incident, shows that the court's charge mitigated any prejudice that might have resulted from the prosecutor's misconduct.

---

[24] The state implicitly concedes, and the record does not indicate otherwise, that the defendant did not invite the misconduct. In addition, even if we found an impropriety in the prosecutor's closing argument, we would not conclude that misconduct during the trial was frequent.

As noted in part I, the jury acquitted the defendant of the more serious charge of sexual assault in the first degree as to the August 2, 2000 incident and acquitted him entirely as to the alleged August 13, 2000 incident. The split verdict provides ample indication that the jury was not unduly swayed by St. Jean's testimony regarding T's credibility as to both incidents or the prosecutor's emphasis of that testimony during closing argument.

Additionally, as previously discussed, the court issued general instructions to the jury regarding its responsibility to assess the credibility of the witnesses. Our Supreme Court has stated that "[i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 485. Here, there has been no showing that the jury failed to follow the court's instructions. To the contrary, the verdict was a strong indication that the jury did, in fact, heed the court's instruction and that its assessment of the evidence was not overborne by the prosecutor's impropriety. Consequently, we conclude that the court's instructions were adequate to ameliorate any harm that otherwise might have resulted from the prosecutor's misconduct. Prosecutorial misconduct did not, therefore, deprive the defendant of his right to a fair trial.[25]

---

[25] The defendant also asks us to reverse his conviction under the plain error doctrine; Practice Book § 60-5; or, in the alternative, to invoke our supervisory powers over the administration of justice. We conclude that the prosecutor's conduct did not constitute plain error. As previously stated, the prosecutor's misconduct did not deprive the defendant of a fair trial. In other words, the misconduct did not constitute plain error because it was not so harmful that it resulted in manifest injustice. See *State* v. *Saez*, 76 Conn. App. 502, 508, 819 A.2d 927 ("party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice" [internal quotation marks omitted]), cert. denied, 264 Conn. 914, 826 A.2d 1158 (2003).

We also conclude that the defendant has not demonstrated, nor does the record disclose " 'a pattern of misconduct across trials' " that would lead

IV

## ADMISSIBILITY OF EVIDENCE

In his third claim, the defendant argues that he was harmed by the court's preclusion of defense evidence concerning T's prior sexual conduct because he claims that such evidence would have impeached T's credibility. Specifically, the defendant claims that the court's improper preclusion of such evidence deprived him of his sixth amendment right to confront T and to present a defense. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. T was the first witness to testify for the state. She testified on direct examination that on August 2, 2000, the defendant took her virginity. Later, the state offered, and the court admitted into evidence, a copy of T's calendar from the year 2000. That calendar bore the following entry, which was written by T on August 2, 2000: "[M]y day! 1st Leo." T explained during direct examination that the entry signified that it was her first time having vaginal sexual intercourse. The court also admitted a copy of T's statement to the police in which she stated that she told the defendant she had no prior sexual experience.

On the next day of trial, defense counsel filed a motion, pursuant to General Statutes § 54-86f, the rape shield statute, to offer evidence concerning T's prior sexual conduct.[26] Defense counsel sought to impeach

_____

us to invoke our supervisory powers to reverse the judgment of conviction. Id., 509 (declining to exercise supervisory powers because requisite pattern of misconduct not present). As such, we decline to do so.

[26] General Statutes § 54-86f provides in relevant part: "In any prosecution for sexual assault . . . no evidence of the sexual conduct of the victim may be admissible unless such evidence is . . . (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct . . . . Such evidence shall be admissible only after a hearing on a motion to offer such evidence containing an offer of proof. . . . If, after hearing, the court finds that the evidence meets the requirements of this section and that the probative value

T's credibility through evidence of her prior sexual conduct. According to defense counsel, because T testified during direct examination that she was a virgin prior to the first alleged sexual assault, evidence to the contrary was admissible under § 54-86f (2) because it was being offered to impeach her credibility. The court conducted a hearing on the motion, during which defense counsel offered the proposed testimony of two witnesses, fifteen year old B, who is the defendant's cousin, and Janine Ritrovato, the defendant's wife. B testified that she met T during the summer of 2000 when she was visiting the defendant's family. She further testified that during her visit, she went to an amusement park with T and the defendant's family at which time T told her that "she was not a virgin" and "that when she was down in New Mexico, she had many boyfriends and six of them she had sex with." When asked by the prosecutor how she and T came to discuss the topic of sexual intercourse, B testified: "We were discussing, like, boys and teenage topics and stuff. And it kind of got to subjects like, so, are you a virgin? I was like, yeah." The prosecutor then asked B if T had specified whether she had had vaginal sex or oral sex, to which B responded that "[s]he just said sexual intercourse." She then testified that as far as she knew, that could have meant oral sex.

Defense counsel then presented the proposed testimony of Janine Ritrovato. When asked by defense counsel whether "there was any incident that would indicate [that T] was not a virgin," Janine Ritrovato testified that T had "made accusations similar to what she did with [the defendant] about her stepdad." During cross-examination, Janine Ritrovato further testified that she did not know if T's prior sexual conduct involved "oral sex, anal sex or vaginal sex."

of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. . . ."

At the conclusion of the testimony, the court denied the defendant's motion. The court based its ruling on, inter alia, its finding that the testimony of the witnesses was not credible, and the court "did not believe that there was a good faith showing that [the evidence] would indicate that there was prior sexual conduct . . . ."[27] The court also held that the prejudicial impact of the evidence far outweighed the probative value. The defendant took exception to the court's ruling.[28] On appeal, the defendant claims that the court incorrectly precluded testimony concerning T's prior sexual conduct. We are unpersuaded.

At the outset, we note that whether the court's exclusion of evidence entitles the defendant to a new trial requires us to resolve three questions. The first is whether the court's ruling was improper. Cf. *State* v. *Saunders*, 267 Conn. 363, 382–85, 838 A.2d 186 (preliminarily examining propriety of trial court's ruling), cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004). Should we answer that question in the negative, we need go no further. Should we answer that question in the affirmative, the second question we must answer is whether that impropriety rose to the level of a constitutional violation. See id., 385. Should we answer that question in the affirmative as well, the third question we must answer is whether the state has demonstrated

----

[27] The court stated: "The court heard from two witnesses, a fifteen year old, who, by my estimation, was thirteen at the time those statements were made to her, and the wife of the defendant. The court at this time is not going to find their testimony credible. I do not believe that there was a good faith showing that this would indicate that there was prior sexual conduct, which would indicate that the alleged victim was making statements about her prior sexual activity. . . . Further, the court feels that this is clearly prejudicial to the victim, and that prejudice far outweighs the probative value."

[28] Defense counsel specifically based his exception on "the federal cases cited under the due process clause, the diluting of the presumption of innocence and its effect on the right to confrontation in the sixth amendment."

that the constitutional impropriety was harmless beyond a reasonable doubt. *State* v. *William C.*, 267 Conn. 686, 706, 841 A.2d 1144 (2004). A negative answer to that third question would warrant a new trial. See id., 709–10.

Thus, in evaluating the merits of the defendant's claim, we begin by reviewing the court's ruling. That task requires us to decide whether the court abused its discretion in excluding the proffered evidence pursuant to § 54-86f. See *State* v. *Thompson*, supra, 266 Conn. 454 ("[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." [Internal quotation marks omitted.]).

As previously noted, the court precluded the proposed testimony on the basis of its conclusion that the testimony was not credible and, therefore, that it was not probative of prior sexual activity. The court's ruling was, in effect, that because the evidence was not credible, it could not have been relevant to the issue of the T's credibility. "One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. . . . Although the trial court has wide discretion in its rulings on the relevancy of evidence . . . its rulings will be reversed if the court has abused its discretion or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Rinaldi*, 220 Conn. 345, 353–54, 599 A.2d 1 (1991). Here, the court's relevancy determination was premised on its assessment that the witness' testimony lacked credibility. We give deference to the

court's findings regarding the credibility of a witness' testimony because it heard and observed that testimony firsthand. See *Morant* v. *State*, 68 Conn. App. 137, 159, 802 A.2d 93 ("[W]e must defer to the court's findings regarding the credibility of those witnesses because it heard and observed their testimony firsthand. As a practical matter, it is inappropriate [for an appellate court] to assess credibility without having watched a witness testify, because demeanor, conduct and other factors are not fully reflected in the cold, printed record." [Internal quotation marks omitted.]), cert. denied, 260 Conn. 914, 796 A.2d 558, overruled in part on other grounds, *Shabazz* v. *State*, 259 Conn. 811, 830 n.13, 792 A.2d 797 (2002). Thus, we will not deem a credibility assessment by the court improper unless the record reveals that it is clearly erroneous. See *State* v. *Hathaway*, 78 Conn. App. 527, 531, 827 A.2d 780, cert. denied, 266 Conn. 909, 832 A.2d 73 (2003). In the present case, our review of the record leads us to conclude that the court's assessment was not clearly erroneous.

Having determined that the proposed testimony lacked credibility, the court concluded that the testimony would not contradict T's testimony regarding her virginity. Thus, we conclude that the court did not abuse its discretion in excluding the proffered testimony. Accordingly, the defendant's third claim fails.

V

JURY INSTRUCTIONS

The defendant's final claim is that certain of the court's instructions to the jury improperly defined the term "likely" in § 53-21 (a) (1) and (2) as meaning "*possible* or probable," thereby diluting the state's burden of proof as to whether the defendant's conduct was "likely to impair" T's health or morals and violating the defendant's federal constitutional right to due process

of law.[29] (Emphasis added.) According to the defendant, the ordinary and proper meaning of the term "likely" is probable, and the court's definition of "possible" improperly lessened its meaning for the jury. Conceding that his claim was not preserved at trial, the defendant asserts that it is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[30] We agree that the claim is reviewable because the record is adequate for our review, and the claim that the court incorrectly instructed the jury as to an element of a charged offense is of constitutional magnitude. See *State* v. *Romero*, supra, 269 Conn. 487. The claim fails, however, under *Golding*'s third prong.

Our Supreme Court addressed the exact same claim in *State* v. *Romero*, supra, 269 Conn. 485–95. In *Romero*, the trial court defined the term "likely" as meaning " 'in all probability or *possibility*.' " (Emphasis in original.) Id., 488. That language was identical to the language used by the court in the present case. In addition, the trial court in *Romero* instructed the jury that for the state to sustain its burden, the state had to prove beyond a reasonable doubt that it was " '*possible* or probable' " that the defendant's conduct " 'would injure or weaken the child's health or morals.' " (Emphasis added.) Id. That additional instruction also was issued in this case.[31]

---

[29] See footnote 4.

[30] In *State* v. *Golding*, supra, 213 Conn. 239–40, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.)

[31] That is understandable because both courts appear to have based those portions of their charges on the text of the model jury instructions contained in J. Pellegrino, Connecticut Selected Jury Instructions: Criminal (3d Ed. 2001) § 7.9 B, pp. 355–57.

Our Supreme Court concluded in *Romero* that instructing the jury that "likely" meant "possible" was improper. Id., 489–92. In light of *Romero*, we conclude that the court's instruction in that regard was incorrect.

That determination does not, however, end our inquiry. Having concluded the jury instructions were improper, we turn then to a consideration, under the third prong of *Golding*, of whether there exists a reasonable possibility that the jury was misled by these improprieties. See id., 492. That consideration requires that we address separately each conviction of risk of injury to a child.

With respect to the defendant's conviction of risk of injury to a child in violation of § 53-21 (a) (2), the facts relevant to our resolution of the issue virtually are identical to those in *Romero*, another case involving sexual assault of a child. See id., 493–94. As in *Romero*, because the jury in this instance found the defendant guilty of having sexually assaulted the victim, we find no basis for any argument that the jury could have been uncertain that such an assault did, in fact, impair the child, as alleged in the risk of injury charge. In short, on these facts, we conclude that the jury could not reasonably have been misled by the court's improper instruction as to the meaning of the term "likely." See id., 493.

Additionally, with respect to the defendant's conviction for risk of injury to a child, in violation of § 53-21 (1), regarding the defendant's having given LSD to T, we also conclude that there is no reasonable possibility that the court's instructional impropriety, when evaluated in light of the entire charge, misled the jury. We note that the court gave the jury a thorough explanation of the concept of reasonable doubt and the state's burden of proving each element of the charged offenses beyond a reasonable doubt. Moreover, as noted in part II C, § 53-21 (1) requires proof beyond a reasonable

doubt that the defendant voluntarily committed an act that was *likely to impair T's health,* and we further observed that evidence was adduced at trial that the act the defendant committed did, in fact, impair T's health. Given that evidence, we do not believe that there is any reasonable possibility that the jury was misled by the court's instructions.

Finally, each time the court improperly defined the term "likely" as "possible," it also gave the proper definition of the term as "probable" or "in all probability." Those accurate instructions minimized the potential harm flowing from the court's inaccurate instructions concerning the meaning of the term "likely." We therefore conclude that, viewing the record and the charge as a whole, there does not exist a reasonable possibility that the jury was misled by the court's instructional improprieties. Accordingly, the defendant's final claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.