### STATE OF CONNECTICUT *v.* LEO F. RITROVATO
### (SC 17323)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.*

---

\* The listing of justices reflects their seniority status on this court as of the date of argument.

Argued March 13—officially released September 26, 2006

*G. Douglas Nash*, special public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Kevin T. Kane*, state's attorney, and *David Smith*, assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Leo F. Ritrovato, appeals, following our grant of certification,[1] from the judgment of the Appellate Court affirming the defen-

---

[1] This court granted the defendant's petition for certification limited to the following issues: "Did the Appellate Court properly conclude that: (1) the trial court did not improperly preclude the defendant's evidence regarding the victim's prior sexual conduct; and (2) the prosecutorial misconduct did not violate the defendant's right to a fair trial?" *State* v. *Ritrovato*, 272 Conn. 905, 863 A.2d 699 (2004).

dant's conviction of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1),[2] sale of a hallucinogenic substance by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b),[3] sale of a controlled substance to a person younger than eighteen years of age in violation of General Statutes § 21a-278a[4] and two counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1) and (2).[5] The defendant's conviction

[2] General Statutes § 53a-71 provides in relevant part: "(a) A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person . . . ."

[3] General Statutes § 21a-278 provides in relevant part: "(b) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. . . ."

[4] General Statutes § 21a-278a (a) provides: "Any person eighteen years of age or older who violates section 21a-277 or 21a-278, and who is not, at the time of such action, a drug-dependent person, by distributing, selling, prescribing, dispensing, offering, giving or administering any controlled substance to another person who is under eighteen years of age and is at least two years younger than such person who is in violation of section 21a-277 or 21a-278, shall be imprisoned for a term of two years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278."

[5] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony."

stemmed from allegations that he had engaged in sexual intercourse with T,[6] a fifteen year old girl, after she ingested a hallucinogenic substance given to her by the defendant several hours earlier.

The defendant challenges the Appellate Court's conclusion that: (1) the trial court did not violate his sixth amendment rights to confrontation and to present a defense by excluding impeachment evidence regarding T's prior sexual conduct; and (2) testimony elicited by the prosecutor that T was a credible witness and the prosecutor's reference to that testimony in closing argument did not deprive him of his federal due process rights to a fair trial. We conclude that the trial court improperly excluded the impeachment evidence and that the improper ruling constituted harmful evidentiary error because it precluded the defendant from challenging T's credibility on the charges of sexual assault in the second degree in violation of § 53a-71 (a) (1) and risk of injury to a child in violation of § 53-21 (2) (sexual assault charges). We also conclude, however, that exclusion of the impeachment evidence and the improper conduct of the prosecutor did not violate the defendant's due process rights to a fair trial on the charges of sale of a hallucinogenic substance by a person who is not drug-dependent in violation of § 21a-278 (b), sale of a controlled substance to a person younger than eighteen years of age in violation of § 21a-278a and risk of injury to a child in violation of § 53-21 (1) (drug related charges). Accordingly, we reverse the judgment of the Appellate Court and remand the

Count three of the substitute information charged that the defendant had violated § 53-21 (2) and was predicated on the allegation of sexual intercourse, whereas, count six charged that the defendant had violated § 53-21 (1) and was predicated on the allegation that the defendant had given the victim a hallucinogenic substance.

[6] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

case for a new trial on the sexual assault charges and affirm the judgment of the Appellate Court on the drug related charges.

The following facts and procedural history are set forth in the opinion of the Appellate Court. "In July, 2000, T moved from New Mexico to Connecticut to live with her cousin, M. Approximately two weeks later, T began baby-sitting for the defendant's three daughters at the defendant's home. On the morning of August 2, 2000, the defendant arrived at M's home to pick up T and to bring her to his home to baby-sit. At trial, T testified that the defendant told her that he was going to get some 'acid.' T then asked if she could have some, stating that she had 'never done acid before.' According to T, after she and the defendant arrived at the defendant's house, he told her that he had twelve 'hits' of 'acid' on a strip of thin paper. T also testified that the defendant asked her if she had ever had sex before because 'acid made him horny, and it made sex more better, more intensified.' The defendant then 'cut up the acid' by slicing the paper into twelve strips and offered T one 'hit.' T asked the defendant to put it on her tongue because she 'didn't know what [she] was doing.' T ingested one piece of the paper that the defendant placed on her tongue. Approximately thirty minutes to one hour later, T began to see 'unusual things' such as a cat singing to her and a rug waving to her. T testified that the effects of the substance she ingested lasted for several hours. In addition, T testified that the defendant told her that the paper he placed in her mouth was LSD[7] and that he uses the terms 'acid' and LSD interchangeably. She also stated that the defendant told her that he would give her the LSD as payment for the hours she watched his children.

[7] " 'LSD' refers to lysergic acid diethylamide; The Merck Index, (9th Ed. 1976) p. 732; which is a hallucinogenic substance." *State* v. *Ryan*, 182 Conn. 335, 336 n.2, 438 A.2d 107 (1980).

"Later in the evening of August 2, 2000, the defendant and his wife, Janine Ritrovato, went to a movie, leaving T to watch the children. The couple returned approximately four hours later and watched a movie with T. About halfway through the movie, Janine Ritrovato went to bed, leaving the defendant and T to finish watching the movie. The defendant then asked T to go for a walk. While walking, the defendant pulled T close to him. T objected to that and walked ahead of the defendant. The defendant then grabbed T from behind and led her to a secluded spot where they engaged in vaginal intercourse. Following the incident, T and the defendant returned to the defendant's home. There, she wrote on her calendar, '[M]y day! 1st Leo.' T testified that this meant that it was her first time having sexual intercourse.

"Not long after that incident, T was forced to move out of M's leased home, as the landlord had expressed concerns about T's occupancy. The defendant and his wife let T stay with them until the problem was resolved. T testified that on August 13, 2000, the defendant again forced her to have vaginal intercourse with him. The following day, T informed her mother and M that she wanted to return to New Mexico. When asked why, T told her mother that she had been 'touched in a way that [she] didn't like.' Later, on August 18, 2000, T told M about both incidents. After hearing T's story, M took her to the police station where T gave a statement. Eventually, T also went to Planned Parenthood of Connecticut, Inc., for a physical examination. There she spoke to counselor Janet St. Jean about the incidents.

"After the defendant was arrested and taken into custody at his home on October 6, 2000, he provided Officer Mark Pilcher of the Norwich police department with a written statement in which he stated that he had

obtained LSD and given it to T on different occasions.[8] According to the defendant's statement, which was admitted into evidence during trial, T asked him to get LSD, and he received M's permission to give it to her.[9] The defendant's statement also contained a denial of any sexual contact with T.

"Trial began on February 26, 2002. On March 13, 2002, the jury found the defendant guilty of sexual assault in the second degree, two counts of risk of injury to a child, sale of a hallucinogenic substance by a person who is not drug-dependent and sale of a controlled substance to a person younger than eighteen years of age. All of those offenses stemmed from the events of August 2, 2000.[10] The defendant was sentenced to a term of twenty-two years imprisonment, execution suspended after seventeen years, and ten years of probation." *State* v. *Ritrovato*, 85 Conn. App. 575, 579–82, 858 A.2d 296 (2004).

The defendant appealed to the Appellate Court from the judgment of conviction claiming, inter alia, that:

[8] The defendant filed a pretrial motion to suppress the statement on the ground that it was involuntary. Following an evidentiary hearing, however, the court denied the motion. Defense counsel nonetheless asked T on cross-examination why she had referred on direct examination to the drugs obtained by the defendant as "my drugs," although he did not ask whether the defendant had given her drugs as described in his confession.

[9] In his statement, the defendant described this event as taking place on August 2, 2000. At trial, the defendant did not object to Pilcher's description of how he had obtained the statement from the defendant or to any of its contents, which Pilcher described in detail. Janine Ritrovato also testified at trial that the defendant admitted to her that he took LSD on August 2, 2000, but she did not testify that the defendant admitted giving the drug to T.

[10] The jury acquitted the defendant of four other charges. These included the charge of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), arising from the alleged assault on August 2, 2000. The jury also acquitted the defendant of all three charges arising from the alleged assault on August 13, 2000, namely, sexual assault in the first degree in violation of § 53a-70 (a) (1), sexual assault in the second degree in violation of § 53a-71 (a) (1) and risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (2).

(1) the trial court improperly had excluded evidence impeaching T's credibility in violation of the defendant's constitutional rights to confrontation and to present a defense; and (2) the prosecutor improperly had elicited testimony that T was a credible witness and had referred to that testimony in closing argument, thus depriving the defendant of his due process right to a fair trial. Id., 578–79. The Appellate Court rejected the defendant's claims and concluded that the trial court properly had excluded the proffered evidence on the ground that it was lacking in credibility and relevance. Id., 601–603. The Appellate Court also concluded that, although the prosecutor improperly had questioned an expert witness regarding T's credibility; id., 595; the trial as a whole was not fundamentally unfair and there was no indication that the jury had been unduly swayed by the improper testimony.[11] Id., 597–98. The Appellate Court affirmed the judgment of conviction and this certified appeal followed.

I

We begin with the defendant's claim that the Appellate Court improperly affirmed the trial court's ruling to exclude evidence of T's prior sexual conduct following her testimony on direct examination that she was a virgin at the time of the first sexual assault. The defendant argues that the trial court abused its discretion under the rape shield statute, General Statutes § 54-86f (2),[12] and violated his sixth amendment rights to

---

[11] The defendant raised two other claims—that there was insufficient evidence to support his conviction on the three drug related charges and that the court gave improper instructions to the jury on the charge of risk of injury to a child. The Appellate Court also rejected these claims, which are not the subject of this appeal.

[12] General Statutes § 54-86f provides: "In any prosecution for sexual assault under sections 53a-70, 53a-70a, and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim,

confrontation and to present a defense by improperly precluding him from introducing the proffered evidence. The defendant specifically contends that the trial court's finding that the evidence was not credible and thus lacked relevance is legally insupportable in light of the fact that the jury, rather than the court, makes determinations of credibility. He further contends that the evidence was admissible under § 54-86f (2), because T testified on direct examination regarding her prior sexual conduct and thereby opened the door to impeachment of that testimony. He also challenges the trial court's conclusion, which was not addressed by the Appellate Court, that the prejudicial effect of the evidence outweighed its probative value. The defendant thus contends that the Appellate Court's improper affirmance of the trial court's ruling, which prevented him from impeaching T, the state's sole witness to the alleged criminal conduct, warrants reversal of his conviction on all counts and a new trial.

The state concedes that there is no legal support for the trial court's ruling to exclude the proffered evidence on the ground that it lacked credibility and relevance.

provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. Such evidence shall be admissible only after a hearing on a motion to offer such evidence containing an offer of proof. On motion of either party the court may order such hearing held in camera, subject to the provisions of section 51-164x. If the proceeding is a trial with a jury, such hearing shall be held in the absence of the jury. If, after hearing, the court finds that the evidence meets the requirements of this section and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. The testimony of the defendant during a hearing on a motion to offer evidence under this section may not be used against the defendant during the trial if such motion is denied, except that such testimony may be admissible to impeach the credibility of the defendant if the defendant elects to testify as part of the defense."

The state nonetheless argues that, with the exception of T's statement to B, the defendant's fifteen year old cousin, that she was not a virgin, the ruling did not constitute an abuse of the trial court's discretion. In the alternative, the state argues that the ruling is sustainable on the ground that the defendant improperly sought to impeach T's testimony with extrinsic evidence pertaining to a collateral matter. The state also contends that, to the extent that the ruling was improper, any impropriety was harmless. We agree with the defendant that the trial court abused its discretion in excluding the proffered evidence and that the improper evidentiary ruling was harmful insofar as it related to the sexual assault charges. We disagree with the defendant, however, that the improper ruling was harmful with respect to the drug related charges.

The following additional facts are relevant to our resolution of this issue. T, the state's first witness, testified on direct examination that the defendant had given her LSD on the morning of August 2, 2000, after bringing her to his home to baby-sit for his children, and that before she ingested the drug, "[h]e asked me if I had ever had sex before, and I told him, no. And he said that was too bad because acid made him horny, and it made sex more better, more intensified." T subsequently testified that, during her walk in the woods with the defendant that same night, when he grabbed her and made suggestive comments, she did not realize that he wanted to have sex with her until she suddenly remembered that, earlier in the day, "he had asked me if I was still a virgin, and he told me that sex was intensified whenever he was on drugs."

During the state's direct examination of T, the defendant asked to voir dire the witness outside the presence of the jury regarding an exhibit marked for identification. The exhibit consisted of a copy of T's calendar from the year 2000, which bore the following entry

written by T on August 2: "[M]y day! 1st Leo." After the voir dire, the defendant informed the court that he wished to discuss the admissibility of evidence regarding T's prior sexual conduct. See General Statutes § 54-86f (2). The defendant explained that he was seeking the court's permission to question T about this subject because she had referred to her virginity twice on direct examination. The court responded that the defendant's request was untimely and deferred consideration of the matter until later in the proceeding. After the jury returned to the courtroom, T testified that the calendar notation referred to the fact that the defendant had taken her virginity. She also testified that the assault was the first time that she had had vaginal sexual intercourse.[13]

Thereafter, during the state's direct examination of T's mother, the defendant renewed his request, outside the jury's presence, for admission of evidence under § 54-86f (2) relating to T's prior sexual conduct. The court responded that it would not hear argument on the matter at that time because the witness had been testifying on a different issue, but would consider and rule on the question at some future time. Following a recess, the court informed the parties that if they wished to introduce evidence concerning T's prior sexual con-

---

[13] The prosecutor asked T the following questions during direct examination:

"Q. What does that say on August 2nd?

"A. My day. It says, first. And then it says, Leo.

"Q. And what is that in reference to? What do you mean by that, my day, first Leo?

"A. He took my virginity from me. And I wrote it down.

"Q. When you say first, I assume you're referring to your first time?

"A. Yes.

"Q. First time what?

"A. First time having sex.

"Q. Okay. Clearly vaginal sex?

"A. Yes."

duct, a motion should be made to that effect and the court would hear the parties at that point.

The state's next witness was Officer Pilcher, who testified that he took T's statement when she initially reported the assaults to the police. Pilcher described T's statement concerning the assaults and, in the course of his testimony, referred to the notation on T's calendar regarding her virginity. He also described the defendant's written confession. Defense counsel did not object at any time to Pilcher's description of the confession and did not cross-examine him regarding its substance.

After Pilcher completed his testimony, the court excused the jury and the parties were heard on whether to admit the evidence of T's prior sexual conduct under § 54-86f (2). The defendant argued that under § 54-86f (2), he was permitted to impeach T's testimony that she was a virgin at the time of the first alleged sexual assault. The court noted that the defendant had failed to ask T about her prior sexual conduct on cross-examination and had not submitted a pretrial motion in limine on the matter, and initially indicated that it would not admit the evidence because it was highly prejudicial to T.

The following day, however, the court informed counsel, outside the jury's presence, that it had reconsidered the previous day's discussion, and had decided to hold a hearing on a motion filed by the defendant earlier that morning seeking admission of the impeachment testimony. The court also ordered T and her mother, who had been planning to return to New Mexico that day, to remain in Connecticut so that they would be available to testify if called by the defense. The defendant then made an offer of proof consisting of the proposed testimony of the defendant's fifteen year old

cousin, B, and the proposed testimony of the defendant's wife, Janine Ritrovato.

B, the first witness to testify during the hearing, stated that she had met T when she was visiting the defendant's family during the summer of 2000. On one particular occasion, when B had accompanied T and the defendant's family to an amusement park, T told B that she was not a virgin. T also told B that "when she was down in New Mexico she had many boyfriends, and six of them she had sex with." On cross-examination, B further testified that "when this whole thing first started, I was telling my mom, like that night, after Six Flags, that [T] was such a skink because she was telling me about how many guys she slept with." B added that the subject of T's virginity had come up because she and T had been discussing boys and other teenage topics. B also stated that T merely referred to having "sexual intercourse," and did not specify whether she had had oral sex.

Janine Ritrovato then testified that T had told her that "part of the reason [T] had to come [to Connecticut] was because . . . she was sleeping with . . . her [best friend's] boyfriend behind her back." Janine Ritrovato also testified that T "made accusations similar to what she did with [the defendant] about her stepdad . . . ." In response to a question by the prosecutor, Janine Ritrovato added that she did not know whether T's sexual conduct had involved oral, anal or vaginal sex.

After reviewing the evidence, the court determined that it did not find the testimony of B and Janine Ritrovato to be credible. The court concluded: "I do not believe that there was a good faith showing that this would indicate that there was prior sexual conduct which would indicate that [T] was making statements about her prior sexual activity. And there was not a

good faith reason to believe that she had no prior sexual activity contrary to her testimony.

"Further, the court feels that this is clearly prejudicial to [T], and that [the] prejudice far outweighs the probative value." The defendant objected to the trial court's ruling on constitutional grounds, thus properly preserving the claim for appellate review.

Although the defendant's principal argument on appeal is that the trial court's exclusion of the proffered testimony violated his sixth amendment rights to confrontation and to present a defense, "we must be mindful that [t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case." (Internal quotation marks omitted.) *State* v. *Cortes*, 276 Conn. 241, 253, 885 A.2d 153 (2005). Accordingly, we agree with the defendant that the trial court abused its discretion in excluding the proffered testimony, but conclude that the court's improper ruling constituted harmful evidentiary error. We therefore need not decide the defendant's claim on constitutional grounds.

"Our analysis of the defendant's . . . [claim] is based on well established principles of law. The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . .

"Relevant evidence, that is, evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence

. . . generally is admissible . . . unless its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or considerations of undue delay, waste of time or needless presentation of cumulative evidence." (Citations omitted; internal quotation marks omitted.) Id., 253–54.

We begin our analysis with § 54-86f, which provides in relevant part: "In any prosecution for sexual assault . . . no evidence of the sexual conduct of the victim may be admissible unless such evidence is . . . (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct . . . . Such evidence shall be admissible only after a hearing on a motion to offer such evidence containing an offer of proof. . . . If, after hearing, the court finds that the evidence meets the requirements of this section and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. . . ."

In the present case, the trial court did not dispute that T testified about her prior sexual conduct during direct examination. T's description of her two conversations with the defendant, in which she told him that she was a virgin, her testimony that the defendant took her virginity and her testimony regarding the notation on her calendar, clearly meet the threshold requirement for the admission of impeachment evidence under § 54-86f (2). The trial court nonetheless ruled to exclude the evidence on the ground that it lacked credibility and relevance and because it was highly prejudicial to T. We conclude that the trial court's ruling cannot be upheld on either ground.

Turning first to the court's credibility determination, it has long been established that "a court maintains the

obligation to ensure [only] that a witness' testimony meets the *minimum* standard of credibility necessary to permit a reasonable person to put any credence in that testimony." (Emphasis added.) *State* v. *Weinberg*, 215 Conn. 231, 243, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). "Whether evidence is admissible is a question of law that is determined according to the rules of evidence. Whether the burden of persuasion has been met and the weight to be accorded to the evidence are questions of fact to be determined by the trier of fact." *State* v. *Aaron L.*, 272 Conn. 798, 824 n.26, 865 A.2d 1135 (2005). Recognizing this principle, the state agrees with the defendant that "there is no indication on the record that either witness lacked minimal credibility . . . ." Consequently, the state does not support this aspect of the trial court's ruling or the decision of the Appellate Court upholding it.[14] We agree with the parties that the trial court's ruling that the evidence was not admissible because the witnesses lacked credibility is not legally sustainable.

Turning next to the potentially prejudicial effect of the impeachment evidence, "[t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging . . . but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 358, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). In this case, the proposed testimony consisted of T's statements to B that she was not a virgin and that she had had sex

---

[14] We note that, in affirming the trial court's ruling, the Appellate Court relied on cases involving a trial to the court which, in the absence of a jury, is required to make the necessary determinations of credibility. See *State* v. *Ritrovato*, supra, 85 Conn. App. 602–603, citing *Morant* v. *State*, 68 Conn. App. 137, 159, 802 A.2d 93, cert. denied, 260 Conn. 914, 796 A.2d 558, overruled in part on other grounds by *Shabazz* v. *State*, 259 Conn. 811, 830 n.13, 792 A.2d 797 (2002); *State* v. *Hathaway*, 78 Conn. App. 527, 531, 827 A.2d 780, cert. denied, 266 Conn. 909, 832 A.2d 73 (2003).

with six previous boyfriends in New Mexico, and T's statement to Janine Ritrovato that she had come to Connecticut, in part, because she had been sleeping with her best friend's boyfriend behind her back. Considered in isolation, these statements might be regarded as unduly prejudicial. Viewed in context, however, we conclude that their probative value on the issue of T's credibility outweighed their prejudicial effect.

We are mindful that the rape shield statute "was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material. . . . Our legislature has determined that, except in specific instances, and taking the defendant's constitutional rights into account, evidence of prior sexual conduct is to be excluded for policy purposes. Some of these policies include protecting the victim's sexual privacy and shielding her from undue harassment, encouraging reports of sexual assault, and enabling the victim to testify in court with less fear of embarrassment. . . . Other policies promoted by the law include avoiding prejudice to the victim, jury confusion and waste of time on collateral matters." (Citations omitted; internal quotation marks omitted.) *State* v. *Christiano*, 228 Conn. 456, 469–70, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994).

The state introduced evidence during its case-in-chief that T was a virgin at the time of the first sexual assault. Such testimony was not necessary to prove an element of the crime but, upon repetition, became inextricably bound with the state's narrative, thus injecting an emotional element into the trial that made the contemptible act with which the defendant was charged seem even more offensive. Accordingly, impeachment testimony that T had engaged in prior sexual conduct would not have unfairly aroused the emotions of the jury and, therefore, would not have been unduly prejudicial, but

would have constituted a reasonable attempt by the defendant to counter the emotionally laden testimony previously introduced by the state regarding T's virginity. We thus conclude that the probative value of the impeachment testimony far outweighed its potentially prejudicial effect.

The fact that two of the impeachment statements referred to T's experiences with other men, and were not limited to the plain and unembellished fact that she was not a virgin, does not mean that the more descriptive statements should not have been admitted. The detailed testimony did not involve an elaborate explanation of the circumstances surrounding T's prior sexual conduct, but merely added substance and credibility to her otherwise conclusory remark to B that she was not a virgin at the time of the first assault. We therefore disagree with the state's claim that the more detailed testimony would have been "highly prejudicial evidentiary overkill."

Finally, the proffered testimony did not constitute inadmissible extrinsic evidence of a collateral matter, as suggested by the state as an alternative ground for affirming the Appellate Court's judgment; see *State* v. *West*, 274 Conn. 605, 640, 877 A.2d 787 ("[a] witness may not be impeached by contradicting his or her testimony as to collateral matters, that is, matters that are not directly relevant and material to the merits of the case" [internal quotation marks omitted]), cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005); but was highly probative on the issue of T's credibility because it directly contradicted her statement that she was a virgin when she was first assaulted. We therefore conclude that the trial court abused its discretion in ruling to exclude the evidence.

We next consider whether the trial court's abuse of discretion constituted harmless evidentiary error. The

defendant argues that the error was harmful with respect to the sexual assault charges because T's testimony and her credibility were the most important part of the state's case, which was demonstrated by the jury's request that her testimony be read back to them during their deliberations. He also contends that "the defendant's proposed impeachment testimony was not cumulative, nor was [T's] credibility so strong as to make an overwhelming case against the defendant. Her claims of rape were not corroborated . . . and impeachment of this sole accuser was essential to his defense." He further contends that his acquittal of the charges stemming from the alleged assault on August 13, 2000; see footnote 10 of this opinion; does not signify that he had successfully impeached T's credibility without the testimony regarding her prior sexual history, because it is not possible to know why the jury acquitted him of those charges. He finally contends that the impeachment testimony would have indicated T's willingness to lie on the witness stand in order to present herself in the best possible light and, therefore, his inability to impeach her testimony was important to the outcome of the case.

With respect to the drug related charges, the defendant argues that the error was not harmless because there was no corroboration of his confession and, under existing law, a confession without corroboration is inadmissible. He also argues that his confession was not uncontested because he attempted to suppress it prior to the trial and defense counsel challenged T on cross-examination as to various aspects of her drug allegations.

The state responds that exclusion of the impeachment evidence was harmless[15] because T's testimony

---

[15] The state claims on appeal that there was no constitutional violation. The state's argument on harmless error, therefore, is based on its conclusion that any error that may have occurred was evidentiary in nature.

that she was a virgin was not offered as proof relating to the issue of consent, but to explain the meaning of the cryptic notation on her calendar, and, therefore, it was not used to show that the defendant had " 'robbed' " her of her virginity. The state also contends that the excluded evidence was only weakly probative in light of the proclivity of teenagers to exaggerate their sexual prowess, especially to peers. The state further contends that the defendant's acquittal on four other sexual assault charges; see footnote 10 of this opinion; suggests that the defendant succeeded in impeaching T's credibility without the additional evidence.

The state claims that any error was harmless for the additional reason that the defendant "effectively admitted culpability for [the drug related] offenses by allowing his confession to the police that he had twice given LSD to [T] to go uncontested at trial." The state also points to corroborating testimony from Janine Ritrovato that she later learned that the defendant had used LSD on August 2, 2000, and that he was under its influence when she arrived home that day and had hidden this information from her. We conclude that the evidentiary error was harmless with respect to the drug related charges, but not with respect to the sexual assault charges.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 352, 904 A.2d 101 (2006). As we have recently noted, "a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 357. "[O]ur determination that the defendant was harmed by the trial court's exclusion of [testimony] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary

harmlessness . . . such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *William C.*, 267 Conn. 686, 708–709, 841 A.2d 1144 (2004).

We begin by examining the sexual assault charges. Because there was no independent physical evidence of the assault and no other witnesses to corroborate T's testimony, her credibility was crucial to successful prosecution of the case. As a result, any evidence suggesting that T might not have been truthful was extremely significant. Moreover, although the defendant cross-examined T regarding the reasons she came to Connecticut and the events leading up to and surrounding the charged crimes, he was not allowed to question her about her claim of virginity, even though this emotionally charged subject was mentioned repeatedly by T and Pilcher during the state's case-in-chief. Finally, the state's case against the defendant could not be characterized as strong, given the lack of corroborating evidence. Although the absence of conclusive physical evidence of sexual abuse does not automatically render the state's case weak where the case involves a credibility contest between the victim and the defendant; see *State* v. *Ceballos*, 266 Conn. 364, 416, 832 A.2d 14 (2003); a sexual assault case lacking physical evidence is not particularly strong, especially when the victim is a minor. Id.; see also *State* v. *Alexander*, 254 Conn. 290, 308, 755 A.2d 868 (2000). Accordingly, cross-examination of T on her claim of virginity, together with the testimony of B and Janine Ritrovato, would

have cast sufficient doubt on T's credibility to have influenced the jury's verdict on the sexual assault charges. We therefore conclude that the defendant has met his burden of demonstrating that the evidentiary error was harmful with respect to the sexual assault charges because, upon consideration of the entire record, we do not have a fair assurance that the error did not substantially affect the verdict.

We conclude, however, that the error was not harmful with respect to the drug related charges, which were unconnected to T's claim of virginity. The defendant admitted in his statement to the police, which was introduced as an exhibit at trial, that he had given LSD to T on the day of the first assault. Janine Ritrovato also testified that the defendant told her that he had taken LSD on the day of the initial assault. Our case law directs that a confession, "if sufficiently corroborated . . . will constitute the overwhelming evidence necessary to render harmless any errors at trial." (Internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 645, 881 A.2d 1005 (2005); *State* v. *Stevenson*, 269 Conn. 563, 596, 849 A.2d 626 (2004). Although there was no corroborating physical evidence or witness on the drug related charges, the defendant did not object to T's testimony that he had given her drugs and raised no objection to Pilcher's testimony that the defendant had confessed to giving T drugs. Accordingly, the defendant's confession, when considered in conjunction with his wife's testimony that he had taken drugs on the day of the first assault, with T's testimony that he had given her drugs and with Pilcher's testimony regarding the defendant's confession, which described how the defendant had obtained the drugs, was sufficient to overcome any doubt that might have been raised as to T's credibility by admission of testimony regarding her prior sexual history.[16] We therefore conclude that the defendant has

---

[16] The defendant's pretrial motion to suppress his confession is irrelevant in light of the fact that the court denied the motion following an evidentiary

failed to demonstrate that the evidentiary error was harmful on the drug related charges and proceed to review the claim of prosecutorial misconduct insofar as it pertains to the drug related charges.

## II

The defendant claims that the Appellate Court improperly concluded that, although the prosecutor overstepped his bounds when he elicited expert testimony that T was a credible witness and subsequently referred to that testimony during closing argument, the defendant was not deprived of his due process right to a fair trial on the drug related charges. The state responds that the Appellate Court correctly concluded that the defendant's constitutional rights were not violated under the test established in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).[17] We agree with the state.

hearing and the confession was introduced into evidence at trial. Defense counsel's cross-examination of T on the drug related charges also fails to demonstrate that the confession was uncontested, because there were no questions challenging the defendant's version of how he had obtained the drugs or had given the drugs to T, the defendant himself did not take the stand to contradict or deny having given the confession and defense counsel did not cross-examine or challenge Pilcher when he described its contents in detail at trial. See *State* v. *Hernandez*, 204 Conn. 377, 383–84, 528 A.2d 794 (1987) (defendant's detailed written confession was strong evidence of guilt because, even though he recanted confession, he did not deny having given it or contest accuracy of police officer's testimony at trial regarding its content).

[17] The state also argues that the defendant's claim of prosecutorial misconduct should not be reviewed because it is not supported by an adequate record. The state suggests that, because this court previously determined that an unpreserved claim of prosecutorial misconduct similar to that alleged in the present case did not implicate the defendant's constitutional rights or result in a fundamentally unfair trial; see *State* v. *Toccaline*, 258 Conn. 542, 549–52 and n.11, 783 A.2d 450 (2001); a constitutional analysis is unwarranted in the present case. The state's claim, however, overlooks this court's subsequent clarification in *State* v. *Stevenson*, supra, 269 Conn. 571–75, that a claim of prosecutorial misconduct, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, supra, 204 Conn. 540. Accordingly, the state's argument

The following additional facts are relevant to our resolution of this claim. On August 23, 2000, several days after the second alleged assault, T went to Planned Parenthood of Connecticut, Inc. (Planned Parenthood) to be tested for pregnancy and sexually transmitted diseases. While at Planned Parenthood, T also received counseling from St. Jean,[18] who described T as "very shy, unsure of herself" and seemingly terrified to be there. St. Jean testified on direct examination that during a counseling session, T stated that a man she was living with had drugged and raped her on one occasion and had forcibly raped her on a second occasion. On redirect examination, when the prosecutor asked St. Jean, without objection by the defendant, whether she found T's account of being drugged and raped to be credible, St. Jean responded that she did.[19] In the early portion of his closing argument to the jury, the prosecutor referred to this testimony when he stated: "St. Jean

that the defendant's claim of prosecutorial misconduct does not implicate his constitutional rights, and thus should not be reviewed, lacks merit.

[18] St. Jean testified that she had been employed at Planned Parenthood for three years and that, in addition to her educational training in counseling, she had completed approximately 600 hours of on-the-job training during which she had witnessed or conducted "hundreds" of counseling sessions. See *State* v. *Ritrovato*, supra, 85 Conn. App. 592.

[19] During redirect examination, the prosecutor asked St. Jean the following questions:

"Q. [O]n the incident that happened when she was talking to you . . . about both instances, without going into detail on them, did you find them credible?

"A. Oh, yes.

"Q. In your opinion as a counselor, a person that's done hundreds of counseling sessions, did you find her statements on being raped twice by that person credible?

"A. Yes.

"Q. Did you find her statements on being drugged by that person credible?

"A. Yes.

"Q. Did you find her statements that . . . force was used against her as credible?

"A. Yes.

"Q. Did you have any reason to doubt what she was telling you?

"A. No."

testified that she had hundreds of hours of training, that she dealt in counseling people that were victims of sexual assault, that when [T] came in she was credible to her. She was afraid. . . . [S]he said that she had been drugged and raped by someone she lived with." The defendant did not object to the prosecutor's reference to St. Jean's testimony.

In its final charge to the jury, the trial court did not address these improprieties specifically, but advised that out-of-court statements made by T to other persons about the assault, including the statements to St. Jean, had been admitted "solely to corroborate or not corroborate [T's] testimony in court, to be considered by you in determining the weight and credibility you will give [T's] testimony here in court." The court further advised: "You have observed the witnesses. The credibility, the believability of the witnesses, and the weight to be given to their testimony are matters entirely within your own hands. It is for you alone to determine their credibility." During its deliberations, the jury requested a playback of St. Jean's testimony and T's testimony on direct examination.

We begin our analysis by setting forth the applicable legal principles. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry,

however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. . . .

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . .

"[I]n cases involving incidents of prosecutorial misconduct that were not objected to at trial . . . it is unnecessary for the defendant to seek to prevail under the specific requirements of State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[20] and, similarly, it is

---

[20] Under State v. Golding, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate

unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, [supra, 204 Conn. 540]. As we stated in that case: In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the constitutional violation exists, and whether it was harmful. . . . Requiring the application of both *Williams* and *Golding*, therefore, would lead . . . to confusion and duplication of effort. Furthermore, the application of the *Golding* test to unchallenged incidents of misconduct tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents

harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.)

of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in claims involving prosecutorial misconduct, therefore, is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves. Application of the *Williams* factors provides for such an analysis, and the specific *Golding* test, therefore, is superfluous. In light of these observations . . . [once] a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 571–75.

Guided by these principles, we first examine whether the prosecutor improperly elicited testimony from the state's expert witness regarding T's credibility when T stated that the defendant had given her LSD. It is well established that a witness may not be asked to comment on the veracity of another witness' testimony. See *State* v. *Singh*, 259 Conn. 693, 706, 793 A.2d 226 (2002). Such questions are prohibited because "determinations of credibility are for the jury, and not for witnesses. . . . Consequently, questions that ask a [witness] to comment on another witness' veracity invade the province of the jury. . . .

"[Q]uestions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. . . . A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved . . . ." (Citations omitted; internal quotation marks omitted.) Id., 707–708.

Moreover, "[w]e repeatedly have stated that an expert may not testify regarding the credibility of a particular

victim." *State* v. *Grenier*, 257 Conn. 797, 806, 778 A.2d 159 (2001); see also *State* v. *Ali*, 233 Conn. 403, 432, 660 A.2d 337 (1995); *State* v. *Freeney*, 228 Conn. 582, 592–93, 637 A.2d 1088 (1994). The reason is that such testimony may be viewed as "a direct assertion that validate[s] the truthfulness of [the victim's] testimony." (Internal quotation marks omitted.) *State* v. *Grenier*, supra, 806.

Although the prosecutor in the present case asked St. Jean to testify regarding T's statements during counseling, the statements in question were similar to T's testimony at trial. According to St. Jean, T told her that she had been "drugged and raped" by the defendant. T's testimony at trial that the defendant had given her LSD on August 2, 2000, and that he had sexually assaulted her several hours later conveyed the same information in a more descriptive and detailed form. The jury thus would have perceived St. Jean's opinion regarding T's credibility during her counseling session as applicable to T's trial testimony. We thus conclude that the prosecutor improperly asked St. Jean to render an opinion regarding T's credibility.

The defendant also claims that the prosecutor improperly referred to St. Jean's testimony during his closing argument. In *Singh*, in which the defendant likewise claimed that the prosecutor had "improperly compelled him to characterize the testimony of other witnesses, and then improperly emphasized that testimony in closing argument"; *State* v. *Singh*, supra, 259 Conn. 702; we concluded that the questioning and remarks were improper. Id., 712; *State* v. *Beaulieu*, 274 Conn. 471, 482–83, 876 A.2d 1155 (2005). In the present case, the prosecutor briefly referred in his closing argument to the fact that St. Jean "testified that she had hundreds of hours of training, that she dealt in counseling people that were victims of sexual assault, that when [T] came in she was credible to her. She was

afraid. . . . [S]he said that she had been drugged and raped by someone she lived with." The prosecutor's reference to St. Jean's opinion directly following his description of her expert qualifications added persuasive force to her testimony. Accordingly, we conclude that the prosecutor's closing argument was improper.

We now turn to whether the prosecutorial misconduct so infected the trial with unfairness as to make the defendant's conviction of the drug related charges a denial of his due process rights pursuant to the six factor test in *Williams*. See *State* v. *Stevenson*, supra, 269 Conn. 575; *State* v. *Williams*, supra, 204 Conn. 540. The defendant argues that: (1) the prosecutor's misconduct was not invited by the defense; (2) the misconduct was severe because case law unequivocally establishes that credibility determinations are to be made by the jury, not by other witnesses; (3) the misconduct was frequent because the jury was exposed repeatedly to St. Jean's testimony during her direct examination, during the prosecutor's closing argument and during the playback of her testimony during jury deliberations; (4) the misconduct related to a critical issue that was central to the case, namely, T's credibility; (5) the misconduct was not cured or ameliorated by a specific jury charge; and (6) the state's case was weak, there being no witness other than T to the incidents in question, no objective physical evidence and few constancy of accusation witnesses to confirm her story. We disagree.

We first note that the misconduct was not invited by the defense and was in flagrant violation of well established law that a witness may not be asked to testify regarding the veracity of another witness' testimony. See *State* v. *Singh*, supra, 259 Conn. 706; *State* v. *Grenier*, supra, 257 Conn. 806. In addition, the misconduct was not cured by an instruction to the jury specifically directed to the improper testimony and closing argument. On the other hand, St. Jean answered

only one question relating to T's credibility on the drug related charges and the prosecutor referred to her testimony only briefly in his closing argument. Accordingly, the misconduct was limited in frequency. In addition, T's credibility was not critical to the state's case on the drug related charges, as it was on the sexual assault charges, because the defendant had signed a written confession admitting that he had given LSD to T on the day of the first assault and had taken LSD himself. This was corroborated in part by Janine Ritrovato, who testified that the defendant had told her that he had taken LSD on the day of the initial assault.

Furthermore, the state's case was strong on the drug related charges because of the signed confession. Finally, although the court did not give a specific instruction on the prosecutorial misconduct, it advised the jury that out-of-court statements made by T to other persons had been admitted to corroborate T's testimony, that the credibility of the witnesses and the weight to be given their testimony was entirely within the jury's hands and that it was for the jury alone to determine the credibility of the witnesses.[21] We therefore conclude that the defendant was not deprived of his due process right to a fair trial under *Williams*.

The defendant's failure to object to the misconduct also defeats his due process claim on the drug related charges. "[T]he absence of an objection at trial [plays] a significant role in the application of the *Williams* factors. . . . [T]he determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to

---

[21] The Appellate Court further concluded, and the state argues on appeal, that the split verdict on the sexual assault charges indicates that the jury was not unduly swayed by St. Jean's testimony regarding T's credibility. *State* v. *Ritrovato*, supra, 85 Conn. App. 597–98. That argument is not applicable to the drug related charges, however, because there was no split verdict on those charges.

any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. . . . Moreover, ordinarily, when a defendant who raises an objection to the allegedly improper remarks of a prosecutor elects to pursue one remedy at trial instead of another, he will not be permitted to claim on appeal that the remedy he pursued was insufficient. . . . In other words, the fact that defense counsel did not object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted.

"We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Moreover as the Appellate Court has observed, defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . . Put differently . . . prosecutorial misconduct claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial

improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Stevenson,* supra, 269 Conn. 575–76.

In light of the defendant's failure to object to the prosecutorial misconduct and our conclusion that the trial as a whole was not unfair under the *Willliams* test, we conclude that reversal of the defendant's conviction of the drug related charges is unwarranted.

The judgment of the Appellate Court is reversed with respect to the charges of sexual assault in the second degree in violation of § 53a-71 (a) (1) and risk of injury to a child in violation of § 53-21 (2) and the case is remanded for a new trial on those charges only; the judgment is affirmed with respect to the charges of sale of a hallucinogenic substance by a person who is not drug-dependent in violation of § 21a-278 (b), sale of a controlled substance to a person younger than eighteen years of age in violation of § 21a-278a and risk of injury to a child in violation of § 53-21 (1).

In this opinion the other justices concurred.

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.